**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Harrison BARHAM, a/k/a Robert Myers, Defendant-Appellant.**

**No. 78–5239.**

United States Court of Appeals;
Fifth Circuit.

May 16, 1979.

---

E. E. Edwards, III, Nashville, Tenn., for defendant-appellant.

J. R. Brooks, U. S. Atty., George C. Batchelor, Asst. U. S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Fictional in many respects, but alas true, this case is a remarkable and often entertaining tale of the bogus and the duplicitous: it involves the false testimony of Government witnesses in the trial of a man who assumed an alias while participating in a scheme to counterfeit money. As with many fascinating and entertaining tales of fiction, however, a serious object lesson lies at the end: the failure of the prosecution to correct false testimony which it knows to be false violates due process if there is any reasonable likelihood that the false testimo-

ny could have affected the judgment of the jury. Accordingly, we reverse.

### Setting The Stage

The defendant James Barham apparently is a rather colorful character, the sort one might expect to meet in the novels of Erskine Caldwell. For thirteen years a truck driver, he later turned to fishing, playing cards, and buying and selling used goods for a living. Apparently he also once tried his hand at moonshining, because in 1971 he was convicted of a federal liquor law violation. Much as he was not content with just one occupation, he was not content with just one name either. In June 1977 he moved from Town Creek, Alabama to Lutts, Tennessee and began using the name Robert Meyer, because, according to his testimony, James Barham was known both to be a good cardplayer (fame apparently being disadvantageous when one goes hunting for pigeons), and an ex-convict, an undesirable status for someone seeking to make a fresh start in a new community.

The Government, however, began to suspect that even as Robert Myers, James Barham strayed from the straight and narrow after moving to Lutts. A series of events in southern Tennessee and northern Alabama between June and October 1977, along with information from confidential sources, led the Government to believe that Mr. Barham had broadened his horizons to include counterfeiting. Accordingly, on November 3, 1977, Secret Service agents executed a search warrant at Barham's 21-acre farm along Route 1 in Lutts, and, after finding there a printing press and various printing paraphernalia, arrested Barham. Barham was subsequently indicted, along with two codefendants, in December. He was charged on one count of aiding and abetting the counterfeiting of Federal Reserve notes,[1] and, in another count, of conspiring to make, possess, and distribute counterfeit Federal Reserve notes.[2]

Mr. Barham put up a vigorous defense. Although his motion to suppress was denied following a hearing, he was somewhat more successful when he first went to trial in February 1978. That first trial, which lasted five days, during which his two codefendants pleaded guilty, ended in a mistrial as to Barham when the jury was unable to reach a verdict. The second trial, conducted in April 1978, also lasted five days. The complexity of the story that unfolded was worthy of William Faulkner. When all was said and done, however—after 31 witnesses for the Government and 13 more for the defense (including Barham himself)—the jury returned verdicts of guilty on both counts. The District Judge, perhaps curious to find out how adept Barham would be at making license plates,[3] then sentenced our protagonist to consecutive terms of 15 and 5 years, and imposed a $1,000 fine (trusting, we presume, that it would be paid in honest-to-goodness, bona fide currency).

Barham appeals on essentially three grounds:[4] (1) the failure of the prosecution to correct material testimony, which the prosecution knew to be false or misleading, of three Government witnesses concerning promises made to them by the Government; (2) the District Court's refusal to instruct the jury on the "theory of the defense" charge tendered by the defendant; and (3) the District Court's failure to find constitutionally deficient the affidavit upon which the search warrant of Barham's property was based.

We resolve the latter two contentions against the appellant. Underlying the first contention, however, are serious considerations—despite the oft-amusing factual background against which they arise—of prosecutorial responsibility and due process of law that ultimately dictate reversal.

A full appreciation of the significance of the false evidence, however, requires a rather thorough understanding of the two conflicting stories presented the jury, and the enhanced importance—given this conflict in the stories—of the credibility of the witnesses. We therefore present the "facts" of the case much like the jury heard them: the prosecution's side first, the defense version second. In the interest of narrative clarity, we develop the two tales (changing the order of witnesses, eliminating minor

---

1. In violation of 18 U.S.C. §§ 2, 471, 472.

2. In violation of 18 U.S.C. §§ 371, 471, 472, 473.

3. Literary license.

4. See also note 24, *infra*.

details, etc.) somewhat differently than they were presented at trial.

### Barham And Friends: Screenplay By The Government

The Government's story begins with a visit by James Barham to his friend, fishing partner, and soon-to-be-coconspirator (and later codefendant) David Simon and his wife Sandra in northern Alabama sometime in the spring of 1977. According to the testimony of Sandra Simon, Barham announced that he and his common-law wife Marti Desforges were "looking for a place * * * out in the country where there [were] no houses nearby for the counterfeiting they were going to do." On a subsequent visit in June 1977, Barham informed Simon that he and his wife had purchased a farm which had a little house on it where they could put the printing press. Barham and David Simon also discussed their respective roles in the counterfeiting operation: Barham was to purchase all of the necessary equipment and Simon was to help in the actual counterfeiting and to sell the finished product.

Shortly thereafter, using his alias Robert Meyer, Barham purchased a used Multilith Model 1250 offset printing press and stored it in a small concrete blockhouse on his property in Lutts. He also purchased a Sandmar camera, used to make negatives for offset printing, and various printing supplies, such as printing plates, film, and developer.

But Barham apparently did not accumulate all of his counterfeiting equipment by honest purchases on the open market. Diane Beech testified that on June 20th Barham and David Simon visited her and her husband Jerry at their trailer near Nashville, Tennessee. In the presence of Barham, Simon mentioned that he needed "a piece of printing equipment," and Jerry Beech said that they could steal the needed equipment from a printing company in Goodlettsville, Tennessee. According to Diane Beech, the three men (Beech, Barham, and Simon) then left in Simon's pick-up truck to get the printing equipment, and later in the evening upon their return placed something in the trunk of Jerry Beech's car.

Jerry Beech testified that at Goodlettsville, he and David Simon broke into a trailer behind the printing company and stole the desired equipment while Barham stood watch outside the trailer. The three men then drove back to the Beech trailer, transferred the equipment to the trunk of Beech's car, and the following morning drove to a spot 25 miles away where the equipment was transferred back to Simon's pick-up truck. Beech also stated that for his assistance in stealing the equipment Barham paid him $30 or $35.

Beech's story of the theft was corroborated by the owner of Dixie Reproductions, a printing supply firm in Goodlettsville, who testified that on the night of June 20, the trailer behind the printing shop was burglarized, and a Rex Rotary plate maker, along with a file storage box for printing plates and negatives, were stolen. An attempt also had been made to break into the main building of the printing firm, but an alarm system apparently foiled that effort.

The counterfeiters-to-be apparently took a brief respite after the burglary of Dixie Reproductions. According to the Government's tale, the next significant activity did not occur until August or September, when Barham paid Charles Fowler, an experienced craftsman in printing photography who worked with the daily newspaper in Florence, Alabama, $75 to repair the Multilith 1250 printing press stored in the concrete blockhouse on Barham's property. Several weeks later, Barham approached Fowler at the Cypress Inn Club, a tavern on the Alabama-Tennessee line, and sought Fowler's assistance in the counterfeiting project. Fowler was reluctant at first, but the $3,000 offered by Barham and David Simon apparently was too much to turn down, and Fowler agreed to print the bogus money. Fowler also advised Barham and Simon about the paper they should use for printing the counterfeit.

On October 7, 1977, Barham bought 10 reams of twenty-pound Assurance opaque bond paper from Printers & Stationers in Florence, Alabama. This purchase completed the procurement of necessary supplies and, on October 9 and 10, Fowler carried

out his end of the deal by making the negatives and doing the actual printing in Barham's concrete blockhouse. On those two days, using a Sandmar camera, Fowler photographed a hundred dollar bill and two twenty dollar bills, developed the necessary negatives, made the plates, and, using ten reams of Assurance opaque parchment paper, printed 5,000 sheets of paper (with one hundred dollar bill and two twenty dollar bills on each). Approximately 1,000 of the sheets were misprints, however, and had to be destroyed. According to Fowler, Barham and David Simon assisted him in the camera work and printing.

The next step was to cut the sheets into individual bills and then to color the funny money an acceptable shade of green. Little testimony was received as to who cut the money or when it was done.[5] The necessary tinting apparently was done at both the Simon and Barham residences. Diane Beech testified that she and her husband Jerry went to the Simons' house to discuss fronting some counterfeit money for Simon and Barham. While there, Sandra Simon was coloring and drying some of the counterfeit. Sandra Simon corroborated this testimony. She placed the Beechs' visit at about three days after the money was printed and stated that on that day she colored about five or six thousand dollars of the counterfeit. She also testified that on October 18 she assisted her husband, Barham, and Barham's wife Marti Desforges color a much larger portion of the counterfeit at Barham's Tennessee farm. According to Ms. Simon, she and Marti Desforges dipped already-cut counterfeit bills into some dye while Barham and her husband dried the dyed bills in an oven and then pressed them. Simon stated that this batch of counterfeit was being prepared for a sale to someone in Louisville, Kentucky, and totalled somewhere between $65,000 and $85,000. She also testified that she had been told by her husband that he, Barham, and someone who worked for the Florence newspaper (Fowler) printed a total of about $800,000.

That much cash is somewhat too much for personal consumption. The last step then was to sell and distribute the counterfeit. According to Diane Beech, her husband received sample counterfeit, which was not colored properly, from David Simon around October 12, and purchased a larger quantity later in the month. Jerry Beech testified to like effect. He stated that he and Joey Shaver met David Simon at the Cypress Inn Club on October 12 or 13 and received sample counterfeit, and that on two or three occasions after that he purchased counterfeit from Simon at 25% face value.[6] Joey Shaver also testified to being shown sample counterfeit by David Simon at the Cypress Inn Club. He further testified that he too had purchased some counterfeit at 25% face value. It was a poor bargain, for he was caught trying to pass the bogus bills in Nashville, Tennessee. At the request and under the supervision of the Secret Service, he purchased another $1,000 from Simon on October 28.

A new addition to the cast of characters, Willie Vereen, wearing "a very fancy black suit and a fancy white polka-dot shirt," testified concerning a more substantial counterfeit transaction. According to Vereen, out of the goodness of his heart[7] he arranged a meeting between two men he hardly knew (later identified as Barham and Simon) and a Mexican known only as Emilio at the Executive Inn in Louisville, Kentucky. Prior to the meeting (if Vereen is to be believed) he had no idea of its purpose, but at the meeting itself he could not help learning that it involved "a transaction of money"—an exchange of about $8,000 in legal currency for about $65,000 in bogus bills.

Secret Service agents rounded out the Government's tale. During their search of Barham's property on November 3, the

5. Diane Beech testified that Sandra Simon had told her that she had seen Barham and Marti Desforges cutting money out at the Barham's place. Sandra Simon, however, denied both the conversation and its substance.

6. According to Beech, Simon told him that the counterfeiters were "him and James" and another man who they paid to do the printing.

7. He stated that he had no financial interest in his brokerage activities.

agents found the Multilith 1250 offset press unplugged, but otherwise in working order, pushed up against one wall of the concrete blockhouse. In a trash pile approximately ten feet beyond a fence on adjoining property, they found a plate file box (later identified as the one stolen from Dixie Reproductions), along with a rubber printing mat, discolored towels, printing charts, and assorted sponges. In a drawer in the bedroom of Barham's house trailer was a receipt, dated October 7, from Printers & Stationers in Florence, Alabama.

Finally, a Government counterfeit specialist, testifying as an expert, stated his conclusions that on the basis of his laboratory examination of some of the appropriated counterfeited bills, all were made from the same plates or negatives. In addition, all were printed on Assurance opaque parchment. He conceded, however, that green ink samples taken from the Multilith printing press could not be associated with the green ink used in the counterfeit currency, nor could the green stains from the towels found in the trash pile be associated with the counterfeit bills.

### Barham And Friends: Screenplay By The Defendant

Barham's story essentially was that while he was a friend and frequent companion of David and Sandra Simon (particularly David), he did not knowingly conspire with them or aid or abet their counterfeiting activities. Indeed, Barham disclaimed any knowledge of their counterfeiting plans or activities. He offered innocent explanations for his behavior that circumstantially connected him to the counterfeiting scheme, and he flatly denied all testimony that directly associated him with the counterfeiting.

He claimed to have bought the rural property in Lutts, Tennessee as an investment for his two daughters. After the purchase he moved into a house trailer on the property, using the trailer as a base of operations. However, he traveled frequently between June and October 1977 and even when "home," his time spent in the trailer was limited largely to sleeping there during the day, as he frequently spent the nights playing cards at the Cypress Inn Club. His familiarity with his property and the immediate vicinity was so sketchy that he was not aware of the trash pile on the adjoining property where the Secret Service agents had found the stolen plate file box. David Simon was a frequent visitor at the Barham property, staying there on several occasions when he and his wife Sandra were having marital squabbles. In fact, according to Barham, Simon knew where the key to the trailer was hidden and had permission to visit the property and fish in several ponds located on it whenever he liked, even when Barham was not there.

Barham explained that he had purchased the Multilith 1250 printing press, the Sandmar camera, and other printing supplies as part of a business venture with his friend Charles Ammerman, who owned a record company and production company in Nashville, Tennessee. Ammerman purportedly planned to expand the operations of the production company, and in conjunction with this plan Barham was to set up and operate the in-house printing operations of the production company. The press and other equipment had to be stored at Barham's place in Lutts because office space for the expanded printing operation was not yet available in Nashville. When, according to Barham, Ammerman and his production company experienced straitened financial circumstances in July and August, the expansion plans in collaboration with Barham had to be abandoned and Barham was stuck with the press and other printing equipment. Early in August he sold the camera and most of the other supplies to David Simon (who, according to Barham, was interested in establishing a screen printing business) but he was unable to unload the printing press.

His purchase of the Assurance bond paper from Printers & Stationers was unrelated to his own aborted printing enterprise, according to Barham. Instead, he explained, he had purchased the paper for, and at the request of David Simon, who did

not want to buy the paper personally because he still owed Printers & Stationers money from a previous order. Barham stated that he had no idea that the paper would be used for counterfeit; rather, he assumed that Simon wanted it in connection with yet another business venture Simon was contemplating, something called "Klean-Roof."

Barham acknowledged his acquaintance with Charles Fowler, but stated that it was limited to cardplaying at the Cypress Inn Club. He denied ever inviting Fowler to his property, giving him permission to use his printing press, or knowing anything about Fowler's printing counterfeit money.

Barham admitted accompanying Simon to the home of Jerry Beech in Nashville on June 20, and then driving with both Simon and Beech to Goodlettsville that same evening. He denied participating in, or even knowing about, any burglary of Dixie Reproductions, however. He testified that he had drunk too much beer that day and that he remained in Simon's pick-up truck when Simon and Beech left the truck for about 10 minutes once in Goodlettsville.

Another trip Barham admitted taking with Simon was to Indianapolis in late October, in order to look at some bulldozers for sale. Barham conceded that he and Simon stopped in Louisville during the trip, but he denied going to the Executive Inn and he disclaimed any knowledge of Willie Vereen or a Mexican named Emilio.

Whatever he and Simon talked about during these trips, and while fishing together or playing cards together, apparently did not include counterfeiting, as Barham categorically denied ever hearing Simon talk about counterfeiting money. He similarly denied hearing Sandra Simon discuss counterfeiting. And, so as to foreclose any mistake as to his professed innocence, he denied ever having knowingly assisted David or Sandra Simon [8] to make counterfeit money, or ever having knowingly agreed with them to make, possess, or distribute counterfeit.

David Simon proved to be an excellent copy-cat, as the story he told tracked Barham's story in all vital respects. Simon confirmed that he had standing permission from Barham to stay and fish at Barham's place whenever he wished, and he stated that he exercised that prerogative frequently.

With respect to the June 20th incident (or nonincident) in Goodlettsville, Simon testified that he and Jerry Beech had merely looked inside the trailer behind Dixie Reproductions (without stealing anything),[9] while Barham remained in Simon's pick-up truck parked across the street. Two or three days later, according to this version of Simon says, Beech brought some printing equipment, including items from the trailer behind the Goodlettsville printing shop, to Simon's house in Alabama.

Simon acknowledged buying the Sandmar camera and other printing equipment from Barham in August. Sometime earlier, he had decided to dabble in counterfeiting, but he had told Barham that he was purchasing the equipment for a planned silkscreen printing business. He also confirmed Barham's story about the purchase of the ten reams of bond paper from Printers & Stationers, that Barham had bought it for Simon and without knowledge of Simon's actual plans. Barham once more lended unwitting assistance to Simon's counterfeiting endeavors when he gave Simon permission to "fool around" with his Multilith offset press. Again, Simon had not informed Barham of his true purpose, but had instead told him that he wanted to print up some contracts for his Klean-Roof Company.

In fact, Simon stated that he never told Barham about his counterfeiting scheme. He independently enlisted Charles Fowler to help him print the bogus money at Bar-

8. Or anyone else, for that matter.

9. Simon elaborated that he had wanted some printing equipment, that Beech had driven him to Goodlettsville to show him the equipment in the trailer and had offered to steal the whole trailer and then sell him the equipment. Simon claimed to have told Beech that he would have no part of such a plan.

ham's place on October 12 and 13, when Barham was not there.[10] Simon was certain about the dates because on October 17 he was scheduled to go to trial in Tuscaloosa, Alabama on charges of armed robbery,[11] and he had been anxious to complete the counterfeiting before he went to trial. Cutting and coloring the money, according to Simon, was done at his house in Alabama, with the aid of his wife Sandra, on October 14 and 15.

Simon testified that on October 12 or 13 he showed samples of freshly printed counterfeit to Jerry Beech and Joey Shavers at the Cypress Inn Club. Both men expressed an interest in purchasing some of the money, but they wanted it on "credit." This, however, was unacceptable to Simon, so he told them he had a "partner" who would not permit the counterfeit to be sold on anything other than a cash basis, but Simon denied mentioning Barham's name in this connection. At some later date, according to Simon, he sold Beech and Shavers approximately $20,000 of the counterfeit each.

Simon also acknowledged selling some counterfeit through Willie Vereen, with whom he claimed to have discussed the possibility of supplying counterfeit on several previous occasions. Simon's version of the transaction was that he stopped at Vereen's liquor store in Louisville en route to Indiana with Barham, went with Vereen to the Executive Inn while Barham remained in his usual seat in Simon's pick-up truck, and exchanged $65,000 to $75,000 of the counterfeit for $6,200 in real money. Vereen, Simon said, planned to use the counterfeit to buy marijuana in Mexico. Again, Barham apparently was ignorant of Simon's counterfeiting activities, Simon having told

him that Vereen was an old Army buddy whom he owed some money.

The testimony given by Barham's wife Marti Desforges squared with the stories of Barham and Simon almost perfectly. Like Barham, she denied participating in any counterfeiting or knowing anything about the counterfeiting activities of David and Sandra Simon. She also denied knowledge of the trash pile where the Secret Service agents found the debris that Simon claimed to have discarded after printing the money on October 12 and 13. With respect to those crucial dates, Desforges testified that she and Barham had left Lutts on October 12 to spend a few days at Briar Patch Lake, Illinois, returning to Lutts on October 15. Curley Pinrod, a singer under contract with Charles Ammerman's production company, confirmed that Barham and Desforges arrived at Briar Patch Lake on the evening of October 12 and stayed there until October 15.

### The False Evidence: The Government Plays Truth Or Consequences

If there is one conclusion that can be drawn with absolute certainty from these two conflicting tales it is that not everyone is telling the truth. Sandra Simon, Charles Fowler, Diane and Jerry Beech, Joey Shaver, and Willie Vereen tell one story of Barham's conscious, continuous, and central role in the counterfeiting operation. On the other hand, David Simon, Marti Desforges, and the defendant Barham himself paint a different picture of Barham as an unwitting pawn of his close friend and companion David Simon. Where, in a case such as this, the jury is confronted with two

---

10. This, of course, conflicted with Fowler's testimony that he did the printing on October 9 and 10, aided by both Simon *and* Barham.

   Simon further testified that after printing the money at Barham's farm, he cleaned up everything and discarded the debris on the trash pile adjacent to Barham's property.

11. The Chief Clerk of the Tuscaloosa County Circuit Court testified that David Simon was indeed on trial in that Court on 14 counts of armed robbery between October 17 and 19. In addition, the jailer of the Tuscaloosa County

Jail testified that Simon had been incarcerated there from the night of October 19 through the afternoon of October 20, when an appeal bond was posted.

   One of the many unresolved discrepancies in the evidence is how David Simon could be on trial in Tuscaloosa between October 17 and 19 (according to his testimony and that of the court clerk from Tuscaloosa), and also be coloring counterfeit money at Barham's place in Tennessee on October 18 (according to Sandra Simon's testimony).

irreconcilable stories, each corroborated several times over, credibility of the witnesses is all important.

Recognizing this, defense counsel for Barham attempted to discredit the testimony of the six key Government witnesses who were implicated in one or more phases of the counterfeiting operation, by inquiring into whether any of them stood to gain anything by testifying for the Government against Barham. He was only partially successful in this endeavor. Diane Beech testified that one reason she turned informant was "for the reward," and a Secret Service agent acknowledged that she had been paid between $2,000 and $3,000 as expense money in connection with her services as informant, and that she expected to receive more as reward money for testifying at Barham's trial.[12] In addition, Sandra Simon testified that she had discussed with Secret Service agents the possibility of receiving a reward for her testimony, but had received no promises; this conversation was confirmed by the Secret Service agent involved.[13] But Barham's counsel was unable to elicit from any of the witnesses admissions concerning promises of leniency or other considerations made by prosecuting authorities in return for their testimony.

The truth of the matter was, however, that three of the witnesses—Diane Beech, Jerry Beech, and Joey Shaver—had received such promises from the United States Attorney for the Middle District of Tennessee, as documented by a letter to the prosecuting attorney in Barham's case (an Assistant United States Attorney for the Northern District of Alabama). That letter, dated February 17, 1978 (prior to Barham's first trial in which the jury was unable to return a verdict), informed Barham's prosecuting attorney that Diane Beech had been promised that she would not be prosecuted in the Middle District of Tennessee if she gave truthful testimony, and that Jerry Beech and Joey Shaver had been told that although they would be prosecuted on *one* felony count, their cooperation would be made known to the sentencing Judge if they too provided truthful testimony.[14] The jury, however, never learned of these promises, and thus was deprived of evidence relevant to the credibility of these witnesses. In fact, the jury received the opposite, and false, impression that no promises had been made to any of the three. An examination of the trial transcript reveals that this false impression was conveyed both by the witnesses' deceptive answers to defense counsel questions and by several unfortunate questions posed by the prosecutor, which, given the circumstances, repeated and reinforced the detions posed by the prosecutor.[15]

(i) Diane Beech responded to defense counsel inquiries in the following evasive fashion:

> judge. Mr. Shaver has, of course, been advised that his failure to testify truthfully on any matter would void the agreement.
> The same statements made to Mr. Shaver were also made to Mr. Beech.
> Special Agents of the Secret Service conveyed the promises to Mrs. Beech and the promises to Mr. Beech and Mr. Shaver were made by myself in the presence of Secret Service agents who will be able to testify if that matter becomes relevant.
> At some point during Barham's first trial, a copy of this letter was given to his attorney, who, however, overlooked it and did not recognize its significance until after the second trial. This circumstance is discussed in footnote 17, *infra*.

---

12. After the trial, she eventually was paid $2,500 by the Secret Service as a reward.

13. Sandra Simon was eventually given $1,500 by the Secret Service for her information.

14. In pertinent part, the letter informed the Assistant United States Attorney for the Northern District of Alabama that

> The witness Diane Beech has been told by the attorney for the Government in the Middle District of Tennessee that she would not be prosecuted for violations prior to the date of her statement over which we had jurisdiction provided she gave truthful testimony concerning all aspects of the investigation. To our knowledge, she has provided truthful testimony to date.
> The witness Joey Shaver has been advised that he will be prosecuted for one felony violation growing out of his counterfeit activities. He has also been told that his cooperation will be made known to the sentencing

15. For emphasis, we italicize certain crucial words in the following excerpts from the trial transcript.

Q. (By defense counsel) Mrs. Beech, when you were talking to the Secret Service, you asked them to promise you that they wouldn't prosecute you for anything if you talked to them, didn't you?

A. No, I didn't ask them to promise me that.

Q. *Did they tell you they wouldn't?*

A. *No.*

Q. You didn't expect that they would not prosecute you in return for your telling them what they were asking you?

A. I hoped that they wouldn't.

Q. And you haven't been prosecuted, have you?

A. I haven't been charged with anything yet.

Q. You don't expect to be, do you?

A. *I haven't had any promises* from any of the attorneys.

Q. Do you expect to be, please, ma'am?

A. I hope not.

Ms. Beech's answer to the second question, as well as her answers to the last two questions, were—to put it charitably—less than honest. Rather than a vague hope that she would not be prosecuted, she had the promise of the United States Attorney for the Middle District of Tennessee, delivered to her by Secret Service agents, that she would not be prosecuted for counterfeit-related offenses she might have committed within that jurisdiction prior to becoming a Government informant.

(ii) Defense counsel questioning of Jerry Beech evoked the following responses:

Q. (By defense counsel) * * * And you know that the government can prosecute you for counterfeiting on several counts, don't you know that?

A. Yes, sir.

Q. And you hope they won't because of your testimony, is that also true?

A. Well, you know, I was charged this past Thursday or Friday for possession of counterfeit money.

*   *   *   *   *   *

Q. And you hope that the government won't prosecute you on those charges because of your testimony in this case, isn't that true?

A. I would hope, you know, hope for the best.

Q. And that's why you're testifying too, isn't it, so you won't have to go to prison, hopefully?

A. Yes, sir.

Q. Or so you'll get some sort of break?

A. Yes, sir.

*   *   *   *   *   *

Q. You know the government can prosecute you for all of those offenses though?

A. Yes, sir.

Q. But you don't know whether they are or not?

A. No, sir.

Q. And that's why you're testifying in this case, is that right?

A. Yes, sir.

These answers were not completely candid (Beech knew he would be prosecuted on one count and he had been promised that if he cooperated that fact would be made known to the sentencing Judge in his case), but Beech's testimony could not yet be characterized as false or deceitful. On redirect examination by the prosecuting attorney, however, the latent deception in Beech's testimony was brought to fruition through several questions which, although perhaps asked quite innocently, were unfortunately quite misleading in the circumstances:

Q. (By prosecuting attorney) Well, sir, you haven't been promised anything by *me*, have you?

A. No, sir.

Q. You haven't been promised anything by anybody in the *Northern District of Alabama*, have you?

A. No, sir.

Q. You weren't arrested by the Northern District of Alabama either, were you?

A. No, sir.

Q. As far as Nashville is concerned, you were arrested and charged up there and your matter is still pending up there, isn't it?

A. Yes, sir.

Q. And you say you're hoping for something, but you really don't know what's going to happen to you, do you?

A. No, sir.

Q. Well, just for the record, are you telling the truth about the circumstances that you know it or are you telling them because you think it will help you?

A. I'm telling the truth like I know it and like it was done.

Q. Well, you know very clearly from me because we've had a discussion about it, you know very clearly from *me* that you're *not* going to get any help from *me* in that case up there, don't you?

A. Yes, sir, you told me that.

The jury, ignorant as it was of the agreement between Beech and the United States Attorney in Tennessee, was in no position to appreciate the limited scope of Beech's truthful statement that he had received no promises from anyone in the Northern District of Alabama. The issue, of course, was whether Beech figured to gain any personal benefits by testifying for the Government. As it was, he had been promised a significant benefit, but in the context of the jury's limited information the natural effect of the prosecutor's questions and Beech's truthful answers was to deny this.

(iii) When Joey Shaver took the stand, the prosecutor did not wait for defense counsel to raise the issue on cross-examination but instead asked Shaver on direct examination about any promises, receiving the following answers:

Q. (By prosecuting attorney) There are cases made on you in Tennessee, aren't there?

A. Yes, sir.

Q. They've been disposed of?

A. No, sir.

Q. *Have you been made any promises* about your testimony here?

A. *No*, sir.

Q. Have *I* made any promises with respect to what might or might not happen to your cases anywhere?

A. No, sir.

Shaver's answer to the next-to-last question was sophistic at best, and while his answer to the last question was truthful in a narrow, literal sense, its effect was to deny much more than the truth warranted.

On cross-examination, Shaver repeated the deception:

Q. (By Barham's attorney) You say *no promises* have been made to you, is that right?

A. *Yes*, sir.

Q. In other words, you know that you can be prosecuted on the charge they have against you?

A. Yes, sir.

Q. But you don't know whether they're going to do that or not?

A. I do know, sir.

Q. You know what's going to happen to you in that case?

A. No, sir.

Q. But you're hoping that something good will happen to you because of your testimony, is that right?

A. I hope I won't get fifteen years.

The testimony heard by the jury, if not outright lies, certainly conveyed the false impression that none of these three witnesses had received any promises of leniency or other considerations. And the Government, through the prosecuting attorney, *knew* that its witnesses had conveyed to the jury something other than the truth. Yet the prosecution made no attempt to correct the false evidence. In fact, although perhaps unwittingly, it reinforced the deception through the questions asked of Jerry Beech and Joey Shaver.

Barham contends that all this combined to deprive him of due process and a fair trial, and that his conviction must therefore be reversed. We agree.

■ In *Napue v. Illinois*, 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, the Supreme Court made clear in no uncertain terms that due process is violated when the prosecutor obtains a conviction with the aid of false evidence which it knows to be false and allows to go uncorrected. It is immaterial whether or not the prosecution consciously solicited the false evidence. It is

also immaterial whether the false testimony directly concerns an essential element of the Government's proof or whether it bears only upon the credibility of the witness. As the Court explained in *Napue*, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend," 360 U.S. at 269, 79 S.Ct. at 1177.[16]

That prosecutorial failure to correct false evidence affecting credibility taints a conviction was reaffirmed by the Supreme Court in *Giglio v. United States*, 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104. The circumstances in *Giglio* were quite similar to those in this case. Defense counsel sought to discredit the testimony of a crucial Government witness (and alleged coconspirator of the defendant) by revealing possible agreements or arrangements for prosecutorial leniency; the witness denied being promised that he would not be prosecuted if he cooperated with the Government, when in fact he had received such a promise; and the prosecution not only failed to correct the false testimony but actually capitalized on it by referring to it in closing argument to the jury. The Supreme Court reversed Giglio's conviction, concluding that "Taliento's credibility as a witness was * * * an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." 405 U.S. at 154–55, 92 S.Ct. at 766. In so doing, the Court announced the standard that controls false evidence or perjured testimony cases: "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Id.* at 154, 92 S.Ct.

at 766; *see United States v. Agurs*, 1975, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342.

We elaborated upon this standard in *United States v. Anderson*, 5 Cir., 1978, 574 F.2d 1347: "The reviewing court must focus on the impact on the jury. A new trial is necessary when there is any reasonable likelihood that disclosure of the truth would have affected the judgment of the jury." *Id.* at 1356. As we explained in *Anderson*, this "reasonable likelihood" standard of materiality is a "low threshold" standard. *Id.* at 1355. It is a brother, if not a twin, of the standard ("harmless beyond a reasonable doubt") for determining whether constitutional error can be held harmless. *See Chapman v. California*, 1967, 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705. A strict standard is appropriate because, as the Supreme Court has explained, false testimony cases involve not only "prosecutorial misconduct," but also "a corruption of the truth-seeking function of the trial process," *United States v. Agurs, supra*, 427 U.S. at 104, 96 S.Ct. at 2397.

■ There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But the fact that we would sustain a conviction untainted by the false evidence is not the question. After all, we are not the body which, under the Constitution, is given the responsibility of deciding guilt or innocence. The jury is that body, and, again under the Constitution, the defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence when it decides the question of guilt or innocence with all its ramifications.

We reiterate that credibility was especially important in this case in which two sets of witnesses—all alleged participants in one

**16.** Elaborating further, the Supreme Court quoted from the New York Court of Appeals decision in *People v. Savvides*, 1 N.Y.2d 554, 557, 154 N.Y.S.2d 885, 136 N.E.2d 853, 854–55:

It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

360 U.S. at 269–70, 79 S.Ct. at 1177.

or more stages of a criminal enterprise—presented irreconcilable stories. Barham was entitled to a jury that, before deciding which story to credit, was truthfully apprised of any possible interest of *any* Government witness in testifying falsely. Knowledge of the Government's promises to Joey Shaver and Diane and Jerry Beech would have given the jury a concrete reason to believe that those three witnesses might have fabricated testimony in order to avoid prosecution themselves or minimize the adverse consequences of prosecution. *Cf. United States v. Sanfilippo,* 5 Cir., 1977, 564 F.2d 176, 178. And the subsequent failure of the Government to correct the false impression given by Shaver and the Beeches shielded from jury consideration yet another, more persuasive reason to doubt their testimony—the very fact that they had attempted to give the jury a false impression concerning promises from the Government. In this case, in which credibility weighed so heavily in the balance, we cannot conclude that the jury, had it been given a specific reason to discredit the testimony of these key Government witnesses, would still have found that the Government's case and Barham's guilt had been established beyond a reasonable doubt. We therefore reverse Barham's convictions and remand for a new trial.[17]

**17.** We pause to address the Government's argument that its failure to correct the false evidence should be excused because Barham's attorney had been given a copy of the letter informing the prosecuting attorney of the promises made to Joey Shaver and Diane and Jerry Beech by the United States Attorney in Tennessee. The Government contends that defense counsel, having received a copy of the letter, was in a position to correct the false evidence by asking specific questions on cross-examination and by introducing the letter into evidence. This case is therefore controlled, according to the Government, by *United States v. Decker,* 5 Cir., 1976, 543 F.2d 1102, *cert. denied,* 1977, 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390. In *Decker,* we held that the Government can discharge its responsibility under *Napue* and *Giglio* to correct false evidence by providing defense counsel with the correct information at a time when recall of the prevaricating witnesses and further exploration of their testimony is still possible. 543 F.2d at 1105. The Government also argues that defense counsel's failure to correct the false evidence should, in these circumstances, be construed as a knowing and intelligent decision of trial strategy and, as such, a waiver of any due process violation.

Defense counsel for Barham candidly admits that he received the copy of the letter, along with other discovery and *Jencks* material, sometime during Barham's first trial. He claims, however, that he did not become aware of the letter and its contents until after the second trial, while preparing this appeal. His oversight, he theorizes, was attributable to the fact that the copy provided him was a carbon copy on plain onionskin paper, containing the body of the letter but not bearing the letterhead of the United States Attorney's office, and was thus inconspicuous among all the other discovery documents.

An examination of the trial transcript, particularly of defense counsel's cross-examination of the key Government witnesses, along with defense counsel's motion for a new trial, persuades us that he was in fact ignorant of the letter during the second trial. All the same, his oversight is inexcusable: a lawyer can normally be held responsible for the contents of discovery documents in his files.

Were this truly a case involving simply the failure of both sides to correct material false evidence—the defense because it had not thoroughly familiarized itself with discovery documents in its possession, and the prosecution because it erroneously, but nonetheless reasonably assumed defense counsel knew the evidence was false and was consciously choosing to let it go unimpeached—we would hesitate to reverse. But this is not such a case. Here, the prosecution did not simply allow the false evidence to go uncorrected. Rather than just an error of omission, there was an additional error of commission—the misleading questions posed to two of the witnesses which, in the unusual circumstances of the case, reinforced the deception. This factor both distinguishes *Decker, supra,* and undermines the Government's argument that defense counsel waived the false evidence issue. While defense counsel can certainly be charged with knowledge of his files, he cannot be held responsible for the manner in which the Government prosecutes its case. Specifically, defense counsel in this case cannot be held responsible for the prosecutor's questions which unfortunately operated to compound the deceit.

By so holding, we do not attribute to the prosecutor any malicious motives or intent to deprive Barham of a fair trial. Indeed, we are sensitive to the plight the prosecutor found himself in once defense counsel began attacking the credibility of the key Government witnesses by asking them about any promises they had received from the Government. In retrospect and with the luxury of considered reflection, it is apparent that the prosecutor should have informed the Court of the situa-

### A Misconceived Theory Of "Theory Of The Defense"

Barham vigorously argues that the District Court erred in refusing to instruct the jury on his proposed "theory of the defense." With the hope that by doing so we can forestall a second debate of this issue at Barham's third trial, and thereby avoid an encore performance of this particular courtroom version of "Much Ado About Nothing," we explain why Barham's position concerning this point is an untenable one.

■ Barham relies on the numerous cases in this Circuit which hold that where there is any evidentiary support whatsoever for the availability of a legal defense, and the Trial Court's attention is specifically directed to that defense, it is reversible error for the Court to refuse to charge the jury concerning that defense.[18] Moreover, the instructions must be sufficiently precise and specific to enable the jury to recognize and understand the defense theory, test it against the evidence presented at trial, and then make a definitive decision whether, based on that evidence and in light of the defense theory, the defendant is guilty or not guilty. Our cases do not hold, however, that a defendant is entitled to a judicial narrative of his version of the facts, even though such a narrative is, in one sense of the phrase, a "theory of the defense." Indeed, our cases hold just the opposite.[19]

■ In this case, the major portion of Barham's proposed, but rejected, Instruction No. 11, presenting his "theory of the defense," was essentially a recounting of the facts as seen through the rose-colored glasses of the defense—glasses that Barham hoped the jurors would wear when they retired to the jury room.[20] Refusing

---

tion, permitting the Trial Judge to ascertain whether defense counsel was making a conscious, strategic decision to let the false evidence go uncorrected. Instead, in the heated, hurly-burly atmosphere of the actual trial, the prosecutor chose to meet fire with fire and disabuse the jury of the notion that *he* had made any promises to the witnesses. In so doing, he apparently overlooked the natural effect this line of questioning would have upon the jury in the circumstances. No matter how innocently asked, however, the fact remains that the questions were misleading and that the prosecutor, in asking them, often reinforced the deception and thereby contributed to the deprivation of due process.

**18.** *See, e. g., United States v. Lewis,* 5 Cir., 1979, 592 F.2d 1282; *United States v. Timberlake,* 5 Cir., 1977, 559 F.2d 1375; *United States v. Taglione,* 5 Cir., 1977, 546 F.2d 194, 197–98; *United States v. Lester,* 5 Cir., 1976, 541 F.2d 499, 502–03; *United States v. Young,* 5 Cir., 1972, 464 F.2d 160; *United States v. Gilbreath,* 5 Cir., 1971, 452 F.2d 92; *United States v. Musgrave,* 5 Cir., 1971, 444 F.2d 755, 764–65; *Bursten v. United States,* 5 Cir., 1968, 395 F.2d 976, 981–82; *Strauss v. United States,* 5 Cir., 1967, 376 F.2d 416, 419.

*Compare United States v. Parker,* 5 Cir., 1978, 566 F.2d 1304 (requested "theory of the defense" instruction properly refused, as "theory" did not constitute a legal defense to the charge), *cert. denied,* 1978, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808; *United States v. Hammons,* 5 Cir., 1978, 566 F.2d 1301 (same), *vacated on other grounds,* 1978, — U.S. —, 99 S.Ct. 68, 58 L.Ed.2d 102.

**19.** *See, e. g., United States v. Malatesta,* 5 Cir., 1978, 583 F.2d 748, 759. *modified on rehearing en banc,* 1979, 590 F.2d 1379; *United States v.* *Wayman,* 5 Cir., 1975, 510 F.2d 1020, 1026–27, *cert. denied,* 1975, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67.

**20.** In its entirety, Barham's "Proposed Instruction No. 11" read as follows:

"I shall now instruct you on what is called the defendant's theory of the case: that is, the view of the evidence under which the defendant submits that you should find him not guilty of the charges in the indictment. I give you the defendant's theory without any implication of approval or disapproval.

The defendant, James H. Barham, acknowledges that he knew David Simon and often associated with him, but he submits that he never had any knowledge that David and Sandra Simon were engaged in counterfeiting money, nor did he ever knowingly or willfully aid and abet them in that criminal endeavor.

If any acts of James Barham had the effect of aiding David or Sandra Simon in their counterfeiting, he submits that his actions were innocently taken without any knowledge of the Simons' criminal activity, and that his actions were without any intent on his part to violate the law.

The defendant submits that he never knowingly became a member of any conspiracy with David or Sandra Simon to make, possess, and distribute counterfeit money. He further submits that he was not aware of the existence of any conspiracy involving David or Sandra Simon, and that he never adopted the object of any such conspiracy to make, possess, and distribute counterfeit money as his own.

The defendant submits that any acts done by him which may have had the effect of promoting any conspiracy involving David or

to give such a proposed instruction was, far from being erroneous, actually quite correct. As the Trial Judge commented, the requested instruction was more in the nature of a jury argument than a charge. It was for defense counsel to make, not the Judge.

The only legally cognizable defense referred to in the proposed instruction was lack of the requisite criminal intent. Stripped of the factual rehash à la Barham, the tendered "theory of the defense" was that Barham, although associated with

> Sandra Simon were without any knowledge on his part of the existence of a conspiracy, or any intent on his part to join or promote any such conspiracy.
>
> James Barham submits that he set out in May and June, 1977, to become engaged in the lawful printing business, and that he took various lawful steps including the buying of printing equipment and supplies to accomplish that goal. Mr. Barham submits that he had no knowledge of David Simon's use of his press for the purpose of counterfeiting money or of any other person using his press in such a manner. He submits that neither David Simon nor anyone else had his authorization, express or implied, to use his press to counterfeit money. The defendant submits that all his actions from June, 1977, until November 3, 1977, were without any knowledge or intent to violate any law, or to aid or conspire with any one in violating any law.
>
> The defendant submits that he was not aware of the existence of the trash pile over the fence on the property adjoining his until November 3, 1977, during the Secret Service search. He did not put anything on the trash pile.
>
> Mr. Barham acknowledges that he bought ten reams of paper on October 7, 1977, at the request of David Simon, but he submits that he had no idea that the paper was meant for an illegal purpose. To the contrary, he submits that he thought he was being asked to get the paper because David Simon owed money to the store where the paper was purchased and that he thought the paper was for a legitimate purpose.
>
> Mr. Barham acknowledges knowing Charles Fowler as a person with whom he played cards, but he submits that he has no knowledge of Charles Fowler's ever having been at his residence. He further submits that he never spoke with Fowler about counterfeiting money or asked Fowler or paid Fowler to counterfeit money on his press or anywhere else.
>
> Mr. Barham submits that, to his knowledge, he has never seen Willie Vereen before the trial of this case. Mr. Barham acknowl-

David and Sandra Simon, did not knowingly and willfully aid or abet them or knowingly and willfully join with them in a conspiracy, either explicitly or tacitly. Barham was unquestionably entitled to a charge that conveyed the substance of this legal defense with sufficient particularity for the jury to intelligently consider it in relation to the evidence presented at trial. As it was, the instructions actually given by the Trial Judge adequately and fairly presented this "theory of the defense." [21] Nothing more was required.

> edges that he made a trip to Indiana with David Simon in October, 1977, to look at some used bulldozers, and that Simon stopped briefly in Louisville. But Mr. Barham submits that he was not aware of any transaction being completed involving counterfeit money, and did not know that Simon had any counterfeit money or that Simon met with Willie Vereen.
>
> For these reasons, James Barham respectfully submits that you should find him not guilty of the charges in the indictment."

21. For example, among the Judge's instructions were the following admonitions:

> Mere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.
>
> *    *    *    *    *    *
>
> A person who has no knowledge of a conspiracy, but happens to act in a way which furthers an object or purpose of the conspiracy does not thereby become a coconspirator. Knowledge on the part of an individual conspirator is a matter of inference from the facts proved.   .   .   .
>
> Before a jury may find that a defendant, or any other person has become a member of a conspiracy, the evidence must show that the conspiracy was formed, and that the defendant or other person who is claimed to have been a member, knowingly and willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy.
>
> To participate knowingly and willfully means to participate voluntarily and understandingly, and with the specific intent to do what the law forbids, or with the specific intent to fail to do what the law requires; that is to say, to participate with the motive or purpose to disregard the law. Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective. If a defendant or any other person, with understanding of the unlawful character of the plan, intentionally encourages, advises or assists, for

### The Affidavit: Was It Enough?

■ Barham also attacks, with equal vigor, the affidavit filed in support of the Secret Service's application for the search warrant of his property in Lutts, Tennessee. Barham contends that the affidavit is deficient, and that the search warrant therefore should have been declared invalid and the fruits of the search suppressed, (a) because the affidavit failed to state underlying facts corroborating an informant's information or demonstrating the reliability and credibility of the informant, and (b) because it contained intentional and material misrepresentations of fact.

This argument was rejected both by the Magistrate who presided over a lengthy suppression hearing and by the Trial Judge, who adopted the Magistrate's recommendation to deny Barham's motion to suppress. And with good reason. Little would be achieved by reproducing the relatively detailed affidavit in its entirety, except perhaps an undue hastening of the need for a third series of the Federal Reporter. It suffices to say that the affidavit appears to be an honest and straightforward recitation (unadorned by the boilerplate so frequently and woodenly inserted in affidavits to satisfy Fourth Amendment standards in the most artificial fashion) of the information then possessed by the Secret Service concerning Barham's probable counterfeiting activities. The affidavit relates the information of not just one, but two informants (one identified by name as Joey Shaver), to the effect that James Barham and David Simon were collaborators in the manufacturing and distribution of counterfeit mon-

ey. In addition, the affidavit contains information from each of these informants placing either the counterfeiting operation or the finished counterfeit bills at Barham's property in Lutts. Furthermore, the affidavit reports that the Secret Service had observed Barham leave his trailer and meet with David Simon shortly after the unidentified informant placed a supervised call to Simon to arrange a purchase of some counterfeit money.

This, together with other information in the affidavit, provided a sufficient basis for an independent determination by a neutral and detached magistrate that probable cause existed. The reports of the two informants corroborated one another, see *United States v. Harris,* 1971, 403 U.S. 573, 580–81, 91 S.Ct. 2075, 29 L.Ed.2d 723 (plurality opinion), and the independent observations of the Secret Service agents served to further buttress the reliability of both informants, see *Spinelli v. United States,* 1969, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637. *See generally United States v. Scott,* 5 Cir., 1977, 555 F.2d 522, 526–27, *cert. denied,* 1977, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478.[22] As for Barham's second contention, we find that if any of the alleged misrepresentations were in fact misrepresentations, they were not material nor were they intentional or reckless within the meaning of *Franks v. Delaware,* 1978, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667.[23]

### Summation

We therefore reject Barham's argument that the search warrant was constitutionally invalid. We also reject his arguments

the purpose of furthering the undertaking or scheme, he thereby becomes a knowing and willful participant, a conspirator.

*Compare United States v. Conroy,* 5 Cir., 1979, 589 F.2d 1258, 1273–74 (instruction actually given "conveyed the substance of the defense theory, even if not in the exact language requested. No more was indispensable.").

**22.** *See also United States v. Maestas,* 5 Cir., 1977, 546 F.2d 1177:

The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe

that the articles sought were located" at the place where it was proposed to search. * * * It is axiomatic that an affidavit for [a] search warrant is to be interpreted in a common sense and realistic manner * * *.
546 F.2d at 1180.

**23.** In *Franks,* the Supreme Court held that a search warrant must be voided if false statements made by the affiant in the affidavit supporting the warrant are shown to have been made knowingly and intentionally, or with reckless disregard for the truth, and if, setting aside the false material, the affidavit's remaining content is insufficient to establish probable cause. *See also United States v. Astroff,* 5 Cir.,

concerning his proposed "theory of the defense" charge.[24]  Because of the uncorrected false evidence of three Government witnesses, however, we reverse Barham's convictions and remand for a new trial.  Thus, yet another jury will be regaled for a week with the two tales of the alleged counterfeiting confederates, but, we trust, this time the Government's tale will not knowingly be tainted by *any* false evidence.

REVERSED AND REMANDED FOR A NEW TRIAL.

1978, 578 F.2d 133 (en banc) (negligent misrepresentations do not invalidate a warrant).

24.  We also reject one final argument which Barham initially urged on appeal, but seems later to have abandoned.  Barham had argued that the Trial Court committed reversible error by ruling inadmissible an allegedly prior inconsistent statement of Sandra Simon.  We have our doubts that the statement the defense sought to introduce was in fact inconsistent with Ms. Simon's testimony at trial, but even if it was the Trial Judge's ruling was proper under F.R.Evid. 613(b).