Robert H. BLANTON, III

v.

Frank BLACKBURN, Warden, Louisiana State Penitentiary.

Civ. A. No. 78–467–B.

United States District Court, M. D. Louisiana.

July 29, 1980.

Lewis O. Unglesby, Baton Rouge, La., for plaintiff, Robert H. Blanton, III.

Aubert Talbot, Dist. Atty., Ascension Parish, Twenty-Third Judicial Dist., Napoleonville, La., Abbott J. Reeves, Asst. Dist. Atty., Gretna, La., for defendant, State of La.

POLOZOLA, District Judge:

Imprisoned for life for murder, Robert H. Blanton, III has filed this application for a writ of habeas corpus. The Court finds the writ should issue because the prosecutor failed to fully disclose to the trial jury agreements made with key prosecution witnesses. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

## I. PROCEDURAL HISTORY OF THIS CASE

Blanton was indicted by a grand jury for the 23rd Judicial District Court for the Parish of Ascension with the murder of Eugene S. Stevens. Jointly indicted with Blanton were Nolan Robert Clayton, Celia Manor Harris and Dr. Cosmos Martello. Blanton was tried separately from the other defendants. After entering a not guilty plea, Blanton was convicted of murder and sentenced to life imprisonment at the Louisiana State Penitentiary at Angola, Louisiana. His conviction and sentence were affirmed by the Louisiana Supreme Court. *State v. Blanton*, 312 So.2d 329 (La.1975). Thereafter, petitioner filed pro se applications for post-trial relief in both the state and federal courts which were denied. Cf. *Blanton v. Maggio*, CA 76–118 and CA 76–119 (M.D.La.1976). In 1978, petitioner, represented by counsel, filed another application for a writ of habeas corpus in the 23rd Judicial District Court. Petitioner contended in his state application that the District Attorney failed or refused to disclose to the trial jury agreements the prosecutor made with key prosecution witnesses. The state district court conducted an evidentiary hearing and denied petitioner's application. Petitioner, seeking to present additional testimony, then filed a motion to reopen the state court proceedings which also was denied. The Louisiana Supreme Court affirmed the decision of the lower court. *State v. Blanton*, 363 So.2d 918 (La.1978). Thereafter, the federal application was filed with this Court. Because the Court did not believe the state court record was complete, the Court held an evidentiary hearing on the federal application.

## II. THE FACTUAL ALLEGATIONS

Petitioner was indicted for murder in violation of LSA–R.S. 14:30. The State of Louisiana alleged that Mavis Hodgeson procured and hired the petitioner, through an intermediary, Dr. C. A. Martello, to "soften up" Eugene Stevens. Stevens had been formerly married to Hodgeson's daughter, Glenda Hodgeson Stevens. Glenda Stevens

had been granted custody of Eugene Stevens' son, and there was a serious controversy over visitation of the child by Eugene Stevens. On February 16, 1972 Mavis Hodgeson and her daughter were ordered to show cause on March 1 why they should not be held in contempt for violating previous court orders which allowed Eugene Stevens to see his son. On February 21, 1972, the state alleges that Robert Blanton, Robert Clayton and Celia Manor Harris killed Eugene Stevens and received a payment of $1,500 for their "services". When Mavis Hodgeson refused to pay the agreed amount plus interest, Blanton, Joyce Wilson and J. W. Wallace allegedly fired shots into the home of Mavis Hodgeson on November 2, 1972 to demonstrate to her that Blanton was serious in collecting the money due him.

At the petitioner's trial, Harris, Clayton, Martello, Wilson, Wallace and Hodgeson testified for the state against petitioner. Harris and Clayton testified they were with petitioner at the time Eugene Stevens was killed. According to these witnesses, Harris went to Stevens' home to get assistance. When Stevens came outside, Clayton fired a shot which killed Stevens. Blanton fired also but did not hit Stevens. Martello and Hodgeson told of their involvement in setting up the murder. Wilson and Wallace testified regarding the shooting of November 2, 1972. The petitioner's defense was alibi and several witnesses were called who testified that the petitioner was in Alabama at the time of the murder. Petitioner's counsel also tried to challenge the credibility of the state's witnesses by attempting to show the prosecutor made deals with the state's witnesses. The jury convicted Blanton of murder. In a separate trial, Mavis Hodgeson was convicted of manslaughter. Her conviction was affirmed on appeal. *State v. Hodgeson*, 305 So.2d 421 (La.1974). After petitioner's trial, Harris plead guilty to a reduced charge of manslaughter and received five years on probation. Clayton also plead guilty to manslaughter and received a sentence of five years imprisonment. He was released from prison prior to serving the five year sentence. Dr. Martel-

lo entered a guilty plea to a reduced charge of being an accessory after the fact to murder. Although Dr. Martello's guilty plea was entered in December of 1974, Dr. Martello had not been sentenced as of the date of the evidentiary hearing conducted by this Court. All charges against Wilson and Wallace were dropped by the District Attorney's office.

## III. THE ISSUES

There are three issues raised by petitioner's application which must be decided by the Court. These issues are:

1. Has the petitioner exhausted his available state court remedies?

2. Did the prosecutor fail or refuse to disclose to the jury and to the petitioner agreements made with key prosecution witnesses?

3. If the prosecutor failed to make a proper disclosure, did such a failure constitute harmless error under the facts of this case?

### A. Exhaustion of State Remedies

■ Although the state argues that petitioner has not exhausted his available state remedies, an examination of the voluminous state record reveals that petitioner has exhausted his state remedies. It is settled that a federal court does not have to decline jurisdiction in a federal habeas corpus action "in the face of allegations that the state courts have been presented with the merits of a claim for habeas corpus relief and have for one reason or another refused or been unable to act upon the claim." *Martin v. Estelle*, 546 F.2d 177 (5 Cir. 1977), cert. denied, 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069. In *Blanton v. Maggio*, CA 76–119 (M.D.La.1976), this Court found that Blanton had exhausted his state remedies. The same issue raised in the 1976 application is again raised in the present application. Since 1976, Blanton has filed another state court application, again raising the same issue he now raises before this Court. Petitioner has properly presented the issues raised in this federal habeas action to the

appropriate state courts and has, therefore, exhausted his available state remedies. *Blankenship v. Estelle*, 545 F.2d 510 (5 Cir. 1977); *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

### B. The Non-Disclosure of Agreements Made With Key Prosecution Witnesses

■ Petitioner contends that the prosecutor failed to fully disclose agreements the prosecutor made with key prosecution witnesses. The failure of the prosecution to correct false testimony which it knows to be false violates due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. In response to petitioner's allegations, the state denies that it made any agreements which were not disclosed to the jury and petitioner. The state also contends that since it was not asked for certain information about the alleged agreements, the answers and information it gave were technically correct, though, this Court must note, not complete.

A full appreciation of the significance of the failure of the prosecution to fully disclose the understandings and agreements made with key prosecution witnesses requires an understanding of the two conflicting stories presented to the jury by the state and the petitioner. The state called two witnesses who were allegedly with the petitioner at the time of the murder and who testified about the killing, including petitioner's role in the murder. In addition the state called the two witnesses who allegedly arranged and paid for the killing who told of their dealings with petitioner. Finally, the state attempted to show by two witnesses that petitioner tried to collect the money due him for the murder by shooting into Hodgeson's home. It is obvious that Clayton, Harris, Martello, Hodgeson, Wilson and Wallace were key witnesses in the state's case. On the other hand, petitioner called numerous alibi witnesses who testified that on the date of the murder the petitioner was in Alabama. The obvious conflict in the stories of the prosecution and defense witnesses enhances the importance of the credibility of the witnesses. If there is one conclusion that can be drawn with absolute certainty from the two conflicting stories it is that not everyone told the truth on the witness stand. Where the jury is confronted with two irreconcilable stories, each corroborated, the credibility of the witnesses is important.

During the trial, petitioner's counsel attempted to discredit the testimony of the six key government witnesses who were implicated in one or more phases of the murder, by inquiring into whether any of these witnesses had made a deal with the prosecution whereby these witnesses would benefit in return for their testimony against Blanton. Blanton was only partially successful and the jury was deprived of important evidence which was relevant to the credibility of the prosecution's witnesses.

An examination of the trial transcript and the voluminous record made during the state and federal court habeas corpus hearings reveals that the jury did not receive a complete, accurate and full understanding of the agreements and understandings the prosecution made with its witnesses. As a result, the jury was required to speculate on certain agreements, and received the opposite and false impression that no promises had been made. This false impression was created by the answers given to questions propounded by defense counsel which, though technically correct, were incomplete. In addition, this false impression was conveyed by the witnesses' deceptive answers to questions and by several unfortunate questions posed and statements made by the prosecution, which, under the facts and circumstances of this case, created confusion, uncertainty and speculation over agreements and deals the prosecution made with its witnesses. Thus, no matter how good defense counsel's argument may have been, it was apparent to the jury that his argument rested upon conjecture—a conjecture which the prosecutor disputed. The purpose of disclosing terms of an agreement made between a key witness and the prosecution is to furnish defense counsel

with information which would allow him to attack the credibility of the witnesses. The defendant gains nothing, however, by knowing that the state's witnesses have a personal interest in testifying unless he is able to impart that knowledge to the jury.

It is noteworthy that none of the agreements or understandings made between the state and its witnesses were brought out by the state in its direct examination of the witnesses. In addition, the entire agreements made were not disclosed to the jury. Further, the state made little effort to correct the obvious incomplete and sometimes inaccurate testimony of witnesses who testified about the agreements made. The fact that the answer given may have been technically correct is not sufficient where the answer is incomplete. The record in this case is voluminous and it would require many pages to quote all of the testimony given on the issues involved in this case in the main body of this opinion. A brief summary of this testimony reveals the following.

Clayton was the person who actually shot the decedent. Although he was indicted for murder, Clayton and his attorney made an agreement whereby the charge against Clayton would be reduced to manslaughter which carries a maximum sentence of 21 years. An agreement was also made with Clayton whereby the prosecution would recommend a five year sentence. This agreement to recommend a five year sentence was never disclosed to the trial jury. The District Attorney defends his failure to disclose the sentence recommendation on the fact that he was not asked if there was an agreement insofar as sentence was concerned. However, although it was brought out in testimony and arguments to the jury that a person convicted of manslaughter could get 21 years, the jury was never told that a five year term would in fact be recommended by the prosecution. During the evidentiary hearing held by this Court, the District Attorney stipulated that he made the agreement to recommend a five year sentence prior to the Blanton trial. Thus, the District Attorney was obligated to reveal this agreement to the jury. Fur-

thermore, Clayton's attorney testified at the federal hearing that other agreements involving other crimes were made with the prosecutor but counsel would not reveal the nature of these agreements because of the attorney-client privilege. These additional agreements were not disclosed to the jury. The record reveals that Clayton was in fact sentenced to five years in jail.

Harris was also indicted for murder. During the federal hearing, counsel for Harris testified that he made a deal with the prosecutor under which Harris would not go to jail. Although no firm agreement was made as to the crime which Harris would plead to or the actual sentence to be imposed, the agreement did provide that Harris would not go to jail. The District Attorney denies that any formal plea bargain was entered into with Harris. The Court finds that there was an understanding agreed to by the state and Harris by which she would not go to jail. This understanding should have been disclosed to the jury. The record reveals that Harris was later given a suspended sentence and did not go to jail.

Dr. Martello denied during his trial testimony that any deal had been made by him or anyone acting on his behalf in exchange for his testimony. The state later disclosed to the jury that the state would reduce the murder charge against Martello to a charge of being an accessory after the fact. During the federal hearing, Martello's counsel also testified that the District Attorney would recommend to the Court that Martello be given the lightest sentence he could get. This agreement was made prior to Blanton's trial but was not disclosed to the jury. The record reveals that although Martello pled guilty to the reduced charge in 1974, he has still not been sentenced by the state court.

Wilson denied at the trial that any deals were made on her behalf. However, at the federal hearing her lawyer testified that an agreement was made whereby Wilson would be released on bond and the charges pending against her would be dropped.

Wilson also testified at the federal hearing and stated she was told to deny that any agreements were made. The District Attorney denies this allegation. The Court need not resolve this dispute. The record reveals that all charges against Wilson were dropped.

Wallace did not testify at the federal hearing. The trial transcript reveals that nothing was disclosed to the jury regarding deals made between Wallace and the state. The Court cannot determine if any agreements were made with Wallace which were not disclosed. The record does reveal that all charges against Wallace were dropped.

 The state defends its actions on the ground that no formal plea bargains were made. In addition, the state contends that the District Attorney answered the questions propounded to him but did not volunteer any information he was not asked. While the Court does not believe the District Attorney acted in bad faith, the Court does find that the District Attorney should have voluntarily provided more information on the agreements made with the prosecution witnesses and should have taken steps to correct testimony given by the state's witnesses which did not fully and completely disclose the full nature and content of the agreement made with the witness which the District Attorney knew or should have known. Although the information supplied may have been technically correct, it was not in all instances complete. Blanton contends that the actions of the state combined to deprive him of due process and a fair trial, and that his conviction must be reversed. The Court agrees. In *Mooney v. Holohan*, supra, the United States Supreme Court ruled that where the prosecutor deliberately suppresses evidence favorable to the defense, the suppression of such evidence constitutes a denial of due process and requires the conviction to be overturned. This constitutional principle was expanded in *Brady v. Maryland*, supra, wherein the Supreme Court held that the suppression of evidence favorable to the accused upon request violates due process where the evidence requested is material

and probative either as to guilt or punishment, irrespective of the good faith or bad faith of the prosecutor. Due process is also violated when the prosecutor obtains a conviction with the aid of false evidence which it knows or should know to be false and allows it to go uncorrected. *Napue v. People of the State of Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). It is immaterial whether or not the prosecution solicited the false evidence. *United States v. Barham*, 595 F.2d 231 (5 Cir. 1979); *United States v. Sanfilippo*, 564 F.2d 176 (5 Cir. 1977). The "principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, supra, 79 S.Ct. at 1177. Whether "the non disclosure was a result of negligence or design", it is the responsibility of the prosecutor to correct the evidence. *Giglio*, supra, 92 S.Ct. at 766. The failure of the state to declare to the defendant and to the trial jury the existence of any promises, agreements, and understandings made with key government witnesses deprives a defendant of due process of law. *Giglio v. United States*, supra; *Williams v. Brown*, 609 F.2d 216 (5 Cir. 1980); *United States v. Barham*, supra. Thus, where the credibility of a witness is "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility", *Giglio*, supra, 92 S.Ct. at 766, the jury is entitled to know of it. The courts "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses". *Blankenship v. Estelle*, 545 F.2d 510, 513 (5 Cir. 1977). A "formalistic exchange of testimony even though technically not perjurious, would surely be highly misleading to the jury, a body generally untrained in such artful distinctions". *Dupart v. United States*, 541 F.2d 1148, 1150 (5 Cir. 1976). The fact that an agreement is contingent on certain factors does not relieve the prosecutor of disclosing the under-

standing or agreement. Thus, in *Boone v. Paderick*, 541 F.2d 447 (4 Cir. 1976), cert. denied, 430 U.S. 959, 97 S.Ct. 1610, 57 L.Ed.2d 811, the court concluded:

> "Finally, we note that rather than weakening the significance for credibility purposes of an agreement of favorable testament, tentativeness may increase its relevancy. This is because a promise to recommend leniency (without assurance of it) may be interpreted by the promisee as contingent upon the quality of the evidence produced—the more uncertain the agreement, the greater the incentive to make the testimony pleasing to the promisor." 541 F.2d at 451.

■ Applying these standards, and considering the voluminous record in this case, the Court concludes that Blanton was deprived of due process when the state failed to fully disclose all of the agreements and understandings it had with key government witnesses and failed to correct testimony which it knew or should have known was false. Thus, the Court must set aside the conviction and order a new trial unless the Court finds the error to be harmless.

C. Was the Error Harmless?

■ *Giglio* does not "automatically require a new trial whenever a combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 92 S.Ct. at 766. A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury". *Giglio*, 92 S.Ct. at 766; *Napue*, supra, 79 S.Ct. at 1178. Thus, a new trial is necessary when there is reasonable likelihood that disclosure of the truth would have affected the judgment of the jury. *United States v. Anderson*, 574 F.2d 1347 (5 Cir. 1978); *United States v. Barham*, supra.

There is no doubt that the evidence in this case was sufficient to support a verdict of guilty. But it is for a jury, and not this Court, to determine Blanton's guilt or innocence. When the jury carries out its responsibilities, the defendant is entitled to a jury that is not laboring under a state sanctioned false impression of material evidence when it decides the question of guilt or innocence.

Credibility was an important issue at the trial. Two sets of witnesses presented irreconcilable stories. Blanton was entitled to a jury that, before deciding which story to believe, was truthfully apprised of any possible interest of key state witnesses in testifying falsely. It is clear that Martello, Harris, Clayton, Wilson, Wallace and Hodgeson were key witnesses for the state. Knowledge of government promises to these witnesses would have given the jury reason to believe that they may have fabricated testimony in order to avoid or minimize the adverse consequences of prosecution. *United States v. Sanfilippo*, supra. Also, the subsequent failure of the state to correct the false impression given by some of its key witnesses "shielded from jury consideration yet another, more persuasive reason to doubt their testimony—the very fact that they had attempted to give the jury a false impression concerning promises" from the state. *United States v. Barham*, supra, 595 F.2d at 243.

Under the facts of this case the Court finds that the harmless error rule does not apply. Because credibility was especially important, the Court cannot conclude that the jury, had it been given specific reason to discredit the testimony of the key state witnesses, would still have found that Blanton's guilt had been established beyond a reasonable doubt. Therefore, Blanton's conviction for the murder of Eugene Stevens must be vacated and set aside.

Therefore:

IT IS ORDERED that petitioner's application for a writ of habeas corpus be and it is hereby GRANTED.

IT IS FURTHER ORDERED that the conviction of Robert H. Blanton, III for the murder of Eugene Stevens be and it is hereby vacated and set aside.

IT IS FURTHER ORDERED that the State of Louisiana is hereby given one hundred twenty (120) days to re-try the peti-

tioner on the said murder charge. If the State fails to timely re-try the petitioner, petitioner shall be released from custody insofar as the murder conviction is concerned.

A copy of the judgment entered herein shall be served on the Attorney General for the State of Louisiana and the District Attorney for the Parish of Ascension by the United States Marshal.

Judgment shall be entered accordingly.