IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 2004 Session

## STATE OF TENNESSEE v. ROBERT WILSON

**Appeal from the Circuit Court for Marion County**
**No. 5935     James C. Smith, Judge**

_____

**No. M2004-00110-CCA-R3-CD - Filed February 4, 2005**

_____

The defendant, Robert Wilson, was convicted of attempted aggravated sexual battery and rape of a child. The trial court imposed consecutive sentences of six years and twenty-five years, respectively. In this appeal, the defendant contends (1) that the evidence is insufficient to support the convictions; (2) that the evidence presented to the grand jury was insufficient to support the finding of the indictment; (3) that the state engaged in prosecutorial misconduct by failing to adequately respond to the motion for a bill of particulars; (4) that the state elicited and failed to correct false testimony in violation of his due process rights; (5) that the trial court failed to exercise its role as the thirteenth juror; and (6) that the sentence is excessive. The judgments of conviction are affirmed. The sentences are modified to four years and twenty-three years, respectively, and are to be served consecutively.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed as Modified**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Philip A. Condra, District Public Defender, for the appellant, Robert Wilson.

Paul G. Summers, Attorney General & Reporter; Richard H. Dunavant, Assistant Attorney General; and Sherry Gouger and Julia Oliver, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In 2000, Susan Audrey Condra, the mother of the minor female victim, separated from her husband and, after a month, began a romantic relationship with the defendant. Within two months, the defendant had moved into the residence that Ms. Condra shared with her son, her mother, her

stepfather, and the victim, C.C.[1]  Approximately, five months later, the defendant, Ms. Condra, and the children moved into the residence of the defendant's mother, where they lived for approximately two months.  From there, Ms. Condra moved with the defendant and her children into a room at Ridley's Motel.  Ms. Condra and the children referred to the residence at the motel as "the one room shack."  The family lived at the motel on two separate occasions, the first time in August and September of 2000 and the second from November of 2000 to February of 2001.  During the month of October 2000, the family stayed at the residence of Ms. Condra's father.  From "the one room shack," Ms. Condra, her children, and the defendant moved into "the big apartment," which was located in a housing project.  In August of 2001, the victim and her brother were removed from Ms. Condra's custody by the Department of Children's Services.  Later, Ms. Condra's parental rights were terminated and at the time of trial, the children were living with a foster family.

Ms. Condra testified that when she was dating the defendant, she drank alcohol every day until she passed out.  She stated that the defendant also drank heavily during their relationship.  Ms. Condra recalled that on one occasion in March or April of 2001, while the family was living in "the big apartment," she awoke in the middle of the night and  heard the victim scream, "No."  Ms. Condra stated that when she looked into the bathroom, she saw the victim facing the defendant and "sitting up partly on the floor."  The defendant had his hand on the back of the victim's head.  When she tried to open the door fully, the defendant prevented her from doing so.

Ms. Condra also testified that on the victim's seventh birthday, the victim was wearing shorts and a bathing suit.  She recalled leaving the residence to purchase items for the birthday celebration and when she returned, she found that the victim's bathing suit had been torn and that she was no longer wearing her shorts.

The victim, C.C.,who was born on June 9, 1994, testified that on her seventh birthday, while the family was living in "the big apartment," the defendant forced her to perform oral sex.  C.C. recalled that she was playing checkers with her older brother when the defendant directed her to the living room.  According to C.C., the defendant, who was seated on the couch, ordered her to "suck his thing," which, she said, looked like "a worm."  C.C. recalled another incident at "the big apartment" when the defendant pulled her into the bathroom and forced her to perform oral sex.  She remembered that her mother tried to open the bathroom door but the defendant "push[ed] on it to where she couldn't open it."  C.C. testified that on a third occasion, when the family was living in "the one room shack," the defendant "came to my bed and was pulling on my feet and he made me suck his thing."  She stated that on each occasion, the defendant instructed her to "suck it like a lollipop."

C.C. also testified that while the family was living in "the big apartment," the defendant had penetrated her anally twice.  She stated that on the first occasion, her mother had gone to visit a relative and "[the defendant] told Josh to go outside and do something and . . . [the defendant] took me to my mom's room and he put it up my butt."  C.C. recalled that on that occasion, she "had to use

---

[1]It is the policy of this court to withhold the identity of minor victims of sex crimes.

the bathroom very bad and [the defendant] wouldn't let [her] go and when he got finished the[re] was crap on it." As to the second occasion, C.C. remembered that she was playing checkers with her brother when the defendant called her into the living room, forced her to lean over a chair, and then "put his thing up my butt." C.C. testified that the defendant penetrated her vaginally while they lived at "the big apartment." She stated that as the defendant was "[t]rying to put his private up [her]," she was "trying to get [the defendant] away from [her] and [she] was kicking."

Josh Condra, the victim's older brother, corroborated the incident that occurred on the victim's seventh birthday. He remembered hearing the defendant tell the victim to "suck it." He and the victim had been playing checkers and when she did not return immediately, Josh walked toward the living room and looked through a hole in the quilt that the family used to divide the living room from the rest of the apartment. He then saw the defendant seated on a chair with the victim on her knees in front of him. Josh testified that both were nude and the defendant's penis was in the victim's mouth. He explained that he did not report the incident to his mother because he was afraid of the defendant, who had beaten him on previous occasions.

Kathy Spada, a nurse practitioner at The Children's Advocacy Center, performed a physical examination of the victim in October 2001. Ms. Spada testified that although the victim's hymen was intact, such a finding did not necessarily mean that there had been no vaginal penetration. She stated that there were no fissures around the victim's rectal area and that the victim had no loss of tone. During cross-examination, Ms. Spada acknowledged that neither the victim's vagina nor anus showed visual signs of trauma such as scarring or healing wounds.

At the close of its proof, the state made an election of the incidents upon which it was relying for conviction. As to count one, wherein the defendant was charged with aggravated sexual battery, the prosecution announced reliance on the incident of oral sex that occurred in the bathroom of "the big apartment" as described by the victim and her mother. As to count two, the state chose to rely on the incident of oral sex that occurred on the victim's seventh birthday.

The defendant's mother, Helen Wilson, testified on behalf of the defense. Ms. Wilson recalled that the defendant, Ms. Condra, and the two children came to live with her in June of 2000 because they had nowhere else to go. She testified that she asked them to leave two months later because the children were "on [her] nerves." Ms. Wilson remembered that she warned her son that "if he didn't get away from that girl and them two kids he was going to end up in trouble." According to Ms. Wilson, the victim and her brother "loved [the defendant] and he loved them." She claimed that the victim called the defendant "daddy" and that he often helped her with her homework.

Kelly Butram, an employee of the Department of Children's Services, testified that on August 31, 2001, he received a call from the police, who reported that the defendant had beaten the victim's brother. He stated that although he did not interview the victim with regard to her claims of sexual abuse, the allegations first came to light during his investigation of the August 31 incident. Butram, who sat in on the interview of the victim conducted by employees of the Children's Advocacy

Center, testified that the children were removed from their mother as a result of the beating and that her parental rights were later terminated.

The defendant testified that he began dating the victim's mother in January of 2000 but that they did not start living together until June of that same year. He stated that they first lived with his mother, then with a friend of his, then at Ridley's Motel, then with Ms. Condra's father, then again at Ridley's Motel, and finally at a housing project in South Pittsburg. According to the defendant, he and Ms. Condra had a rocky relationship but he chose not to leave because of his concern for the children. The defendant testified that on the victim's seventh birthday, Ms. Condra took the victim to get her ears pierced and the family had a cookout. He denied having any sort of sexual contact with the victim on that or any other day. The defendant, who claimed to be a father figure to the children, admitted beating the victim's brother with a belt, explaining that he was "flustered." He contended that the victim's mother claimed to have been sexually abused as a child and often discussed the abuse in front of the victim.

I.

The defendant contends that the evidence is insufficient to support the convictions. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Rape of a child, a Class A felony, is defined as follows:

> Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age.

Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as:

> sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required.

-4-

Tenn. Code Ann. § 39-13-501(7). Aggravated sexual battery, in this instance, is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim" where "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). Attempt is defined as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
> (b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

Tenn. Code Ann. § 39-12-101(a), (b). Attempted aggravated sexual battery is a Class C felony. See Tenn. Code Ann. §§ 39-13-504(b), 39-12-107(a).

As to the conviction for rape of a child, the proof established that the victim and her brother were playing checkers in another room when the defendant called the victim into the living room. There was testimony that the defendant forced the victim to perform oral sex, directing her to "suck it like a lollipop." The victim's brother provided corroboration, testifying that he saw the nude victim kneeling in front of the nude defendant and saw the defendant's penis in the victim's mouth. As to the conviction for attempted aggravated sexual battery, the victim testified that the defendant pulled her into the bathroom and, while her mother and brother slept, directed her to "suck his thing." She recalled that her mother tried to open the door but the defendant would not let her. The victim's mother corroborated her testimony. The jury, as fact-finder, was free to accredit or reject any portion of each witness' testimony in reaching its conclusion. See Tenn. Const. art. I, § 19; Byrge, 575 S.W.2d at 295. Because a rational trier of fact could have found the essential elements of each of the crimes beyond a reasonable doubt, the evidence was legally sufficient to support the conviction. See Jackson v. Virginia, 443 U.S. 307 (1979).

## II.

The defendant contends that the state violated his due process rights by presenting a witness to the grand jury who lacked sufficient first-hand knowledge that he had committed the crimes with which he was charged. The state asserts that the evidence submitted to the grand jury is not subject to review by this court.

It is well established that "that the sufficiency and legality of the evidence considered by the grand jury is not subject to judicial review." State v. Carruthers, 35 S.W.3d 516, 532 (Tenn. 2000); see also Burton v. State, 214 Tenn. 9, 15-18, 377 S.W.2d 900, 902-904 (1964) (refusing to dismiss an indictment that was based upon inadmissible hearsay); State v. Dixon, 880 S.W.2d 696, 700 (Tenn. Crim. App. 1992) (refusing to dismiss an indictment that was based on evidence that had been suppressed under the Fourth Amendment); State v. Gonzales, 638 S.W.2d 841, 844-45 (Tenn. Crim. App. 1982) (refusing to dismiss an indictment that was based upon unsworn testimony to the grand jury); State v. Grady, 619 S.W.2d 139, 140 (Tenn. Crim. App. 1979) (refusing to dismiss an indictment that was based upon inadmissible hearsay testimony); State v. Northcutt, 568 S.W.2d 636, 639 (Tenn. Crim. App. 1978) (refusing to dismiss an indictment because of a question asked of a witness by the foreman of the grand jury). In Burton, our supreme court stated the rule as follows:

> "If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. . . . An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. . . .
> . . . In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial."

377 S.W.2d at 904 (quoting Costello v. United States, 350 U.S. 359, 363-64 (1956)). In Parton v. State, 2 Tenn. Crim. App. 626, 455 S.W.2d 645, 648 (1970), this court ruled that while "the grand jury should require the production of the most satisfactory and convincing evidence which the case permits, . . . an indictment may not be abated because it is founded on hearsay evidence." The panel held that "[t]he legality and sufficiency of evidence heard by the grand jury is not subject to review." Id. "Where an indictment is valid on its face, it is sufficient to require a trial of the charge on the merits to determine the guilt or innocence of the accused, regardless of the sufficiency or legality of the evidence considered by the grand jury." Carruthers, 35 S.W.3d at 532-33.

The indictment here is valid on its face. In consequence, the quality of the evidence presented to the grand jury is not subject to appellate review. The defendant is not entitled to relief on this issue.

III.

The defendant next asserts that the state engaged in prosecutorial misconduct by providing a bill of particulars that was insufficient and misleading. The state submits that its answers to the request were both responsive and sufficient to allow the defendant to prepare a defense.

Tennessee Rule of Criminal Procedure 7 provides that "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." Tenn. R. Crim. P. 7(c). A bill of particulars serves three purposes. First, the bill of particulars "serves 'to provide defendant with information about the details of the charge against him if this is necessary to the preparation of his defense.'" State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991) (quoting State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984)). Second, it helps the defendant "avoid prejudicial surprise at trial." Id. Finally, it enables the defendant to preserve a plea against double jeopardy. Id. A bill of particulars is not, however, a discovery device and is limited to information a defendant needs to prepare a defense to the charges. Tenn. R. Crim. P. 7(c), Advisory Commission Comments.

In Byrd, our supreme court recognized that in child sexual abuse cases, the victim is often not able to recall the exact date upon which an offense may have occurred. Our high court ruled, however, that the state must disclose any information it may have concerning when the offense was committed. The supreme court observed that "[t]here is always the possibility that descriptive information can be made available that will tend to narrow the time-frame of the indictment, even if exact dates cannot be provided." Byrd, 820 S.W.2d at 742. The high court warned that by "withholding relevant information, the prosecution runs the risk that an otherwise valid conviction will ultimately be set aside." Id. The defendant, however, is not entitled to relief unless he can demonstrate that he was hampered by the lack of specificity. Id.

Here, the indictment charged the defendant with aggravated sexual battery and rape of a child that occurred "between January 1, 1999 and August 30, 2001." In his motion for a bill of particulars, the defendant asked the state to identify the exact location of each offense, the time of day or night, the identity of any persons who were residing at or visiting the relevant location, the specific nature of the sexual contact alleged, the date of the first report of the offenses, the nature of any physical evidence, the age of the victim at the time of the offenses, and the circumstances whereby the defendant had the opportunity to commit the offenses. In its response, the state provided the locations of the offenses, the nature of the offenses (oral penetration), all parties residing in each of the relevant locations, the time frame of the occurrences (between August 1999 and August 2001), and the circumstances under which the defendant had the opportunity to commit the crimes.

The defendant specifically alleges that the state was aware that one of the incidents occurred on the victim's seventh birthday but failed to disclose that information in the bill of particulars. While the transcript of the trial indicates that the state did not, in fact, provide the information in the bill of particulars, the record demonstrates that the prosecution had informed the defendant prior to trial that one instance of oral sex had occurred on the victim's birthday. Moreover, the defendant has failed to establish how his defense was hampered by the absence of this information in the bill of particulars. There is simply no proof as to how the defense would have been conducted differently had the bill of particulars contained the additional information. Because the defendant has not shown how the state's failure to further particularize the charges impaired his defense, no relief is warranted on this ground. See Id. at 741.

IV.

The defendant next contends that the state engaged in prosecutorial misconduct by soliciting testimony at trial that it knew to be false and by failing to correct the information. His complaint is based upon the testimony of state witness Kathy Spada and defense witness Kelly Butram. He claims that Ms. Spada knowingly provided false testimony in order to bolster the credibility of the victim when she stated that the victim had a thick, septate hymen. During cross-examination by defense counsel, however, Ms. Spada acknowledged that the report she prepared during the examination of the victim contained the following description: "septate hymen, thin, regular, wide." The witness later stated that the word "thin" referred to different tissue than the "septate hymen."

With regard to Butram, the defendant contends that the state knowingly solicited false testimony during the following colloquy:

> Question:    And as far as your comment of no physical evidence, wasn't that in regard to any DNA semen samples, things of that nature that were able to be collected from [C.C.] at the time Nurse Spada saw her?

> Answer:    That's right.

He claims that this testimony was false because Butram later testified at the hearing on the motion for a new trial that he had never personally received reports of DNA testing in a child sexual abuse case.

In State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993), this court held that "it is a well-established principle of law that the state's knowing use of false testimony to convict an accused is violative of the right to a fair and impartial trial." "When a state witness answers questions on either direct or cross examination falsely, the district attorney general, or his assistant, has an affirmative duty to correct the false testimony." Id. (citing Giglio v. United States, 405 U.S. 150 (1972); Napue v. Illinois, 360 U.S. 264 (1959); Blanton v. Blackburn, 494 F. Supp. 895, 900 (M.D. La. 1980); Hall v. State, 650 P.2d 893, 896 (Okla. Crim. App. 1982)).

In this case, the defendant has failed to establish that either witness provided false testimony. The defendant thoroughly cross-examined Ms. Spada regarding the apparent inconsistency between her report and her testimony during direct examination. During redirect examination, Ms. Spada explained the reason for the inconsistency. Ms. Spada acknowledged that there was no physical proof supporting the victim's allegations. With regard to Butram, there is no discrepancy between his trial testimony and the testimony he provided at the hearing on the motion for a new trial. That the witness had never received a report of DNA testing in a child sexual abuse case does not mean that he was not referring to such physical evidence in his report. Under these circumstances, the state was under no duty to correct the testimony. The defendant is not entitled to relief on this ground.

V.

The defendant complains that the trial judge failed to properly exercise his role as thirteenth juror. He claims that the trial judge improperly considered photographs taken of Josh Condra after he was beaten by the defendant. The photographs were not admitted into evidence at trial.

Rule 33 of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Tenn. R. Crim. P. 33(f). The purpose of the thirteenth juror rule is to be a "'safeguard . . . against a miscarriage of justice by the jury.'" State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985)). The rule requires that the trial judge must be personally satisfied with the verdict. State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995).

In State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995), our supreme court acknowledged the restoration of the thirteenth juror rule as it existed at common law, thereby mandating that trial judges exercise the duty to function as a thirteenth juror in criminal cases. An order overruling a motion for new trial establishes a presumption that the trial court has exercised the duty and no explicit statement on the record is required. Carter, 896 S.W.2d at 122; see also State v. Robert Bacon, No. 03C01-9608-CR-00308 (Tenn. Crim. App., at Knoxville, Jan. 8, 1998). It is only when the trial court expresses dissatisfaction or disagreement with the jury verdict or makes statements indicating that it has absolved itself of its responsibility that the judgment should be set aside. See Bacon, slip op. at 19.

In Moats, 906 S.W.2d 431 (Tenn. 1995), the state conceded that the trial court had failed to act as thirteenth juror by entering the judgment while expressing doubts about the weight of the evidence and concluding that it was inappropriate to overturn the jury verdict. Our supreme court determined that because the trial court had misconstrued its authority to grant a new trial under the thirteenth juror rule, a new trial was necessary:

> The trial judge is in a difficult position to make a thirteenth juror determination after a remand which would not occur until after the case works its way through the appellate courts. By that time, the trial judge is unlikely to have an independent recollection of the demeanor and credibility of all the witnesses.

Moats, 906 S.W.2d at 435.

Here, the trial court denied the defendant's motion for a new trial and expressed no doubt about the verdict:

> I've made an independent evaluation and I've independently weighed the evidence, I find that the State has proved all the essential elements of the crimes charge[d] and for which [the defendant] was convicted beyond a reasonable doubt.

The record indicates that the trial judge was aware of his duty to act as thirteenth juror and that he clearly understood his authority under the rule. There was no proof that the trial court considered the photographs of Josh Condra in making its thirteenth juror determination. In our view, the trial court properly exercised its role as thirteenth juror.

VI

As his final issue, the defendant contends that the sentence is excessive. He complains that the trial court erred by the application of certain of the enhancement factors and by ordering consecutive sentencing. The defendant has also asked this court to review the sentence in light of the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. ____, 124 S. Ct. 2531 (2004). The state submits that the defendant has waived any challenge to his sentence under Blakely by failing to raise the issue at trial. Alternatively, the state asserts that the sentence is appropriate under both the terms of the 1989 Sentencing Act and under the reasoning of Blakely.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class C felony conviction is the minimum in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the presumptive term. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the presumptive term. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

There was no testimony at the sentencing hearing. In arriving at sentences of six years for the attempted aggravated sexual battery conviction and twenty-five years for the rape of a child conviction, the trial court applied the following enhancement factors: (2) that the defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range; (9) that the defendant has a previous history of unwillingness to comply with a sentence involving release into the community; and (16) that the defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(2), (9), (16) (2003). The trial court assigned "great weight" to enhancement factor (2), observing that there was "an extensive amount of proof" regarding the defendant's criminal behavior with respect to the victim and her brother. The trial court assigned "some weight" to enhancement factor (9) and "great weight" to factor (16). There were no mitigating factors.

The defendant concedes that factor (2) is applicable based upon his prior convictions but asserts that the trial court erred by assigning great weight to the factor based upon his prior criminal behavior. The state submits that, under the terms of the 1989 Sentencing Act, the trial court appropriately considered the defendant's criminal behavior in its application of enhancement factor (2). In State v. Carico, 968 S.W.2d 280, 288 (Tenn. 1998), our supreme court held that "evidence of the appellant's prior sexual acts [with the victim] was properly considered by the trial court as criminal behavior." Under our traditional law, the trial court properly considered the defendant's prior sexual assaults on the victim and his physical assault of her brother as criminal behavior.

The defendant also contends that the trial court erred by applying enhancement factor (16), that the defendant abused a position of private trust. In State v. Kissinger, 922 S.W.2d 482, 487 (Tenn. 1996), our supreme court held that "[t]he determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship." Here, the defendant testified at trial that he acted as a father figure to the victim. He stated that he bought food and clothes for her, helped her with her homework, and disciplined her when she misbehaved. There was proof that the victim's mother, because of her drinking problem, left much of the care of the children to the defendant. Under the terms of the 1989 Act, the trial court did not err by applying this factor.

Finally, the defendant has asked this court to review the sentence under the reasoning of Blakely. Initially, the state contends that the defendant's Blakely claim is waived because it was not raised in the trial court. Recently, however, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position:

> We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum. However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi

as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474, 120 S. Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1, 153 L. Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro, ___ U.S. at ___, 124 S. Ct. at 2526-27. Perhaps this resulted from the fact that Ring overruled a case that had held the opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

   In any event, even if Blakely did not establish a new rule, the United States Supreme Court in Apprendi stated that the defendant's right to have a jury find facts that increase his sentence above the prescribed statutory maximum is rooted in his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial. 30 U.S. at 476, 120 S. Ct. at 2355. In State v. Ellis, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997), this court held that although there was no common law right to waive a jury trial, Rule 23, Tenn. R. Crim. P., allowed a defendant to "waive a jury trial if the waiver is in writing and is knowingly executed." Absent a written waiver, "it must appear from the record that the defendant personally gave express consent [to waive a jury trial] in open court." Ellis, 953 S.W.2d at 221. Blakely, as an extension of Apprendi, also requires proof in the record that the defendant personally waived that right.

This reasoning is persuasive. The defendant's Blakely claim in this case has not been waived.

The United States Supreme Court's opinion in Blakely calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, 124 S. Ct. at 2537. Finally, the Court concluded that "every defendant has a right to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2543.

Under the rule established in Blakely, the defendant's prior convictions may be used to enhance the sentences. The record establishes that the defendant has fifteen prior convictions. The trial court gave "great weight" to factor (2). The other enhancement factors applied by the trial court,

(9) and (16), are not based upon prior convictions and were not admitted by the defendant. In consequence, the holding in Blakely would preclude their application. Under the rationale of Blakely, which controls, a sentence of twenty-three years for rape of a child, three years above the presumptive sentence, is warranted. Similarly, the appropriate sentence under Blakely for attempted aggravated sexual battery is four years.

The defendant also asserts that the trial court erred by ordering consecutive sentencing. Initially, it is our view that the ruling in Blakely does not apply to the imposition of consecutive sentences. See State v. Gregory Robinson, 146 S.W.3d 469, No. W2001-01299-SC-R11-DD, slip op. at 26 n.14 (Tenn. Sept. 28, 2004) (noting that several courts have rejected the applicability of Apprendi and Blakely to the consecutive sentencing determination); State v. Cedric Anthony, No. W2004-00255-CCA-MR3-CD (Tenn. Crim. App., at Jackson, Dec. 10, 2004) (holding that Blakely does not apply to the consecutive sentencing determination); State v. Demetrie Owen, No. M2003-01454-CCA-R3-CD (Tenn. Crim. App., at Nashville, Dec. 3, 2004) (same);State v. Michael L. Wallace, No. E2003-01719-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Nov. 23, 2004) (same). In consequence, we will review the trial court's imposition of consecutive sentences under the terms of the 1989 Sentencing Act.

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[2] exist:

> (1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;

---

[2]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

(3)   The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)   The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5)   The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)   The defendant is sentenced for an offense committed while on probation; or

(7)   The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

The trial court ordered consecutive sentencing on the following grounds:

Moving back then to the other issue, that is, whether the sentences should be concurrent or consecutive.  Of course, the code sets out those factors that may be used in justifying consecutive sentences, that's 40-35-115 and the Court has offered certain factors.  The second one being the defendant is an offender who[se] record of criminal activity is extensive.  I've already stated his criminal activity when I was talking about enhancement factor Number 2.  So that factor is supported.

Number 5.  Convicted of two or more statutory offenses involving sexual abuse of a minor.  With consideration of aggravating circumstances arising from the relationship between the defendant and the victim, time span of the undetected sexual activity, the nature and scope of the sexual acts and the extent of their physical and mental damage to the victim.  I've already touched on . . . the parent-child relationship, so that fits into this factor.  The time span . . . while not as we some times see years and years, and years, there was a time span, . . . they lived in what the children referred to as the one room shack which was the place behind Ridley's or Ridley's apartments behind a local restaurant and she related a[n] incident when the mom was in the shower and he made her suck his penis and then there are other, the others that we referred to at the big apartment.  There was a span of time.  It wasn't an isolated two[-]week time or three[-]week time, it was a number of months.

-14-

Nature and scope I've already touched on those. Some of it was oral sex and . . . I realize the proof was vigorously contested . . . as to whether there was any evidence of anal penetration or vaginal penetration. She testified as to events and I found her to be a credible witness, so the nature and scope of the acts were fairly extensive and those are the factors I find to be different aspects of Factor Number 5.

Factor Number 6. He was on probation technically out of General Sessions Court at the time, but the Court weighs his criminal activity great weight is placed in this analysis on the man's both record of convictions and the other activity that I've already related to concerning Josh and [the victim] that's Factor 2 under the analysis [of] Factor 5. The Court puts great weight on that, the nature of the offense and the other matters that I have discussed, not so much weight, but like I say, he was technically on probation and he does have an extensive criminal history, but I took that in to account in Factor Number 2. I don't put great weight, but when I analyze all of the factors I think it warrants that he serve his sentences consecutively. I don't take any great pleasure in announcing such a long sentence, but I've objectively as possible analyzed the enhancing factors, the factors as it relates to consecutive sentences and they simply apply here.

The defendant does not contest the trial court's finding that he was eligible for consecutive sentences pursuant to Tennessee Code Annotated section 40-35-115(b)(2), (5), and (6). Instead, he asserts that the consecutive sentences are not necessary to protect the public from him. The trial court placed particular emphasis on section (b)(5) in ordering consecutive sentencing, observing that the defendant and the victim had a father-daughter relationship and that the sexual activity took place over a period of months. The record also establishes that the defendant was on probation at the time he committed the rape of the victim and that he has an extensive criminal record. In our view, the trial court did not err by ordering consecutive sentences.

Accordingly, the judgments of conviction are affirmed. The sentences are modified to consecutive terms of four and twenty-three years.

_____
GARY R. WADE, PRESIDING JUDGE

-15-